IN THE UNITED STATES DISTRICT COURT

THE DISTRICT OF UTAH,  CENTRAL DIVISION

| UNITED STATES OF AMERICA, | **MEMORANDUM DECISION AND ORDER** |
|---|---|
| Plaintiff, | |
| v. | |
| PITSHOU YUNGA KAFUKU, | Case No. 2:18-cr-181 |
| Defendant. | Judge Clark Waddoups |

Before the court is Defendant Pitshou Yunga Kafuku's Motion to Suppress. (ECF No. 17.) Mr. Kafuku alleges that he was subject to an unlawful search and that the Fourth Amendment exclusionary rule requires this court to suppress all evidence found during the search of his residence on March 15, 2018. During the search, officers located apparently fraudulent documents, equipment for creating such documents, counterfeit currency, and other contraband (Complaint, ECF No. 1), the discovery of which items eventually led to Mr. Kafuku's indictment on the crimes alleged in this action. (Indictment, ECF No. 1.) The court heard evidence on this matter on September 5, 2018 (ECF No. 36), received briefing, and heard further evidence and oral argument on November 16, 2018. (ECF No. 54.) Having considered the evidence and the parties' arguments, and otherwise being fully informed, the court concludes that the warrant was invalid but that Mr. Kafuku does not have standing to bring this Fourth Amendment challenge and therefore DENIES Mr. Kafuku's Motion.

## FACTS

On March 15, 2018, approximately ten officers from the Unified Police Department searched 1059 East 600 South #33, an apartment at the Brigadoon apartment complex in Salt

Lake City, Utah ("the Brigadoon apartment"). (Tr. 6, 11, 18; Exhibit 3.) The officers conducted

the search pursuant to a warrant that Detective Todd Madsen[1] authored and that Justice Court

Judge Paul C. Farr signed. (Tr. 19; Exhibit 3.) The warrant was a part of an investigation into a

stolen vehicle.

To secure the warrant, Detective Madsen submitted an electronic warrant and affidavit by

email to the judge. (Tr. 42: 17–21.) He used "a template" to "fill in all of the pertinent

information and then" sent it "to the on-call judge." (Tr. 42: 21–23.) The affidavit stated,

> On Tuesday, March 13, 2018, detectives from the Unified Police
> Department were notified of the possible location of a stolen
> vehicle taken from Las Vegas Nevada sometime in February 2018.
> Based on the nature of the theft, and the fraudulent means
> surrounding how the vehicle was obtained, detectives applied for
> and w[ere] granted a GPS tracking warrant to place on the vehicle
> and safely take any suspects into custody, as well as retrieve the
> keys to the car, which were taken in the vehicle at the time of theft.

(Exhibit 3.) The affidavit then details officers' efforts to track the vehicle over a two-day period,

during which time they were unable to execute a traffic stop of the vehicle but learned that it had

on occasion parked at the Brigadoon apartment. The affidavit makes no reference to any

evidence other than the keys, but asserts that

> [d]etectives have identified three separate drivers of the stolen car
> on different occasions and never [have been] able to safely effect
> an arrest. The keys to the vehicle have been confirmed to be inside
> the apartment of #33 and police would like to make the arrests of
> several offenders of possession of a stolen vehicle, as well as
> retrieve the keys for the car to the owner.

---

[1] Detective Madsen is a detective for the Unified Police Department. (Tr. 5: 14.) He has been a
detective for "a little over a year and a half." (Tr. 5: 22.) He has worked in law enforcement for
"over seven years." (Tr. 5:25–6:1.) He has attended "various trainings, specifically related to
auto theft and interviewing and interrogation." (Tr. 6:11–13.) He testified that during his career
he has "recovered in the hundreds of stolen vehicles," including some instances in which
fraudulent means were used to obtain the vehicle. (Tr. 53: 7–8., 13–15)

(Exhibit 3.) Upon the affidavit and no other evidence, the magistrate signed the warrant just eight minutes after receiving the application and without any further communication with Detective Madsen. (Tr. 43: 3–16.) The warrant authorized detectives to search for the following: "Keys to a stolen vehicle, any other evidence of the auto theft, and any and all illegal contraband located during the scope of the search for keys." (Exhibit 3.)

During the evidentiary hearing on the Motion, Detective Madsen, Detective Kresdon Bennett, and Detective Jaren Fowler testified as to their investigatory efforts and the results of the search. The officers also testified about their understanding of Mr. Kafuku's interest in the apartment. Mr. Kafuku also addressed his interest in the apartment. Detectives Madsen and Bennett also provided details of the theft and their understanding of how theft by fraud occurs and as a result what evidence could be expected and where it could be expected. Notably, however, all of those views were justification after the warrant had issued and none were communicated in the affidavit upon which the warrant was based. The court details the testimony below. Much, if not all, of the testimony is irrelevant to the issue of whether the warrant was properly issued, but it is provided for the context in which the court resolved the motion to suppress.

## THE INVESTIGATION

Detective Madsen explained that on March 13, 2018, he "received a tip about an auto theft or possible location of a stolen vehicle." (Tr. 6: 19–21.) Detective Madsen then "made some phone calls and [did] some investigative work on that specific case to the Las Vegas Metropolitan Police Department." (Tr. 7: 5–8.) Detective Madsen understood from his conversation "that the vehicle was listed on NCIC as stolen out of the Las Vegas McCarran Airport." (Tr. 7:11–13.) He learned "that the vehicle was obtained by fraudulent means," specifically that it "was taken or obtained using the identity of another person who is . . . a

frequent renter of vehicles from this specific company," and that the person under whose name the car was rented had been "contacted about returning the car a few weeks later and stated that he did not rent a vehicle from Las Vegas nor had he been in Las Vegas." (Tr. 7: 14–21.)

According to the tip Detective Madsen received, the allegedly stolen vehicle was located at an apartment complex in Salt Lake City, in the Millcreek area ("the Millcreek complex"). (Tr. 8: 3–5, 30: 21–25.) "[O]n a couple of different occasions," officers "went to the [Millcreek] complex to try to locate a vehicle within several hours of each other." (Tr. 8: 8–10.) Another officer in Detective Madsen's precinct "locate[d] the vehicle that evening." (Tr. 8: 11–13.) The officer observed the vehicle at the Millcreek complex. (Tr. 31: 1–9.) But law enforcement did not seize the vehicle while it was parked at the Millcreek complex.[2] (Tr. 31: 20–24.) Instead, "[b]ased on the information that [Detective Madsen] received from Las Vegas and [because] there was a nexus to another crime," Detective Madsen "authored a search warrant for a warrant for GPS tracking." (Tr. 8: 16–19; Exhibit M.) "[S]everal hours" passed between the time that Detective Madsen received the tip and that he got the GPS monitor (Tr. 30: 3–19), but Detective Madsen requested the warrant before any officer actually saw the vehicle. (Tr. 32: 11–14.) After placing the tracking device on the vehicle, officers "electronically monitored the vehicle, where it was going to and from, from the apartment to other locations around Salt Lake Valley." (Tr. 8: 20–9: 4.)

While tracking the allegedly stolen vehicle, officers did not stop it because there is a "climate right now" in which "there is a propensity for fleeing[,] which is an extreme danger to

---

[2] Detective Madsen explained that, despite the fact the vehicle was at the Millcreek complex for a period of several hours, they did not search that location because they "didn't know of a specific apartment number." (Tr. 58: 16–25.)

the public and violation" of UPD policies.[3] (Tr. 9: 7–10.) Instead, officers "followed the vehicle for . . . about 24 hours" until "it landed back at a specific apartment in Salt Lake City on multiple occasions and [they] set up surveillance at that apartment to wait for the vehicle to again go mobile." (Tr. 9: 15–20.) Detective Madsen observed "the vehicle go mobile with two different occupants, drivers," on two different occasions. (Tr. 10: 1–3.) Officers surveilled the car "around town but again [were] not able to safely take [anyone] into custody given the circumstances." (Tr 10: 3–5.)

Detective Madsen testified that even when the vehicle was stopped for long periods of time, in those instances there were no officers who "were actually in the area." (Tr. 24: 15–18.) For instance, he testified that officers "were all at home not working" while "the car . . . stopped in West Valley or Magna for four or five hours." (Tr. 34: 24–25.) And "when [they] were out actively surveilling the vehicle physically, as well as GPS monitoring, there was not a time during that tracking where [they] could get into the area of the vehicle where it stopped long enough where we could safely take somebody into custody." (Tr. 34: 23–35: 6; *see also* Tr. 109: 11–15.) When the vehicle stopped overnight, Detective Madsen was at home. (Tr. 35: 8–13.) He admitted that other officers may have been able to stop the vehicle. (Tr. 35: 14–16.) When

---

[3] Detective Madsen admitted that conducting a search pursuant to a warrant at a residence also presents safety issues and that there is a specific risk to officer safety in that environment. (Tr. 40: 18–41: 8.) But an arrest in public presents a threat to the public and "innocent civilians." (Tr. 52: 14–21.) As Detective Bennett described, "In a residence or an apartment . . . there [are] unknown circumstances . . . , but we have that unknown threat contained into a specific building." (Tr. 101: 10–14.) A traffic stop, on the other hand, involves a risk that the driver will "flee at high rates of speed causing a significant risk to the innocent motoring public . . . . So there is much more of a risk to the innocent . . . civilian motoring public and community that way than putting ourselves at risk. I would rather put ourselves at risk in a contained somewhat unknown area of an apartment or house." (Tr. 101: 18–25.) He admitted, however, that the risks associated with stopping a vehicle are ameliorated once the driver is removed from the vehicle. (Tr. 102: 7–10.)

defense counsel asked if perhaps it simply was "not a huge priority," Detective Madsen responded, "Sure." (Tr. 35: 17–19.)

Detective Bennett was one of the officers tasked with "surveillance on the vehicle in the attempted stop of that vehicle once it stopped at a location." (Tr. 92: 3–9.) He testified that, at one point, the vehicle stopped at a gas station where he "attempt[ed] to get a visual of the occupants," but "then it left that gas station and drove to" the Brigadoon. (Tr. 92: 22–25.) While conducting mobile surveillance, Detective Bennett's view of the vehicle was impaired by his need "not to get too close" so that he did not "get [himself] identified as law enforcement," especially because he was the only officer in the area and did not have backup. (Tr. 93: 4–8, 13–21.) According to departmental policy, he could not conduct a stop at the gas station because he did not have backup. (Tr. 93: 25–94: 7.) Detective Bennett did not personally see the vehicle at the Brigadoon and did not see the occupants get out. (Tr. 95: 1–16.)

Expecting the vehicle to return to the Brigadoon apartment,[4] officers waited in that location and eventually "identif[ied] the driver[5] of that particular occasion walk into a specific apartment at the complex." (Tr. 10: 10–17.) Initially officers had not been able to see which apartment they were entering, so a part of the investigation was determining which specific apartment. (Tr. 55: 13–22.) But "when the person . . . returned to the apartment," officers observed "the keys . . . in the hand of the driver . . . walking into the apartment so [officers] . . .

---

[4] Because they were unable to determine who was responsible for the vehicle, they focused on the Brigadoon as the "common denominator." (Tr. 56: 2–9.)

[5] Detective Madsen testified that he never observed Mr. Kafuku driving the vehicle, nor did he know of anyone else seeing Mr. Kafuku driving. (Tr. 34: 1–3.) At other times Samy Lihau and Kriss Bonina drove the vehicle. (Tr. 44–45.) Despite this fact, at least one of the known drivers, Mr. Lihau, was released on scene after the search, while Mr. Kafuku was taken into custody. (Tr. 48.)

knew there were keys to the vehicle, they were observed in the hand of the driver walking into that specific apartment." (Tr. 20: 5–14.) A detective "followed the people from the vehicle up to the apartment and walked by it as they were going in." (Tr. 111: 5–7.) Upon this observation, Detective Madsen "authored a search warrant for the apartment and was granted that search warrant." (Tr. 10: 21–22.)

The Brigadoon apartment complex has a long driveway, approximately 478 feet from 600 South leading to the complex. (Tr. 36: 20–37: 2, 114: 23:15: 5; Exhibit G.) Officers waited on 600 South, while the vehicle returned home via the driveway. (Tr. 38: 6–11.) There was also a parking structure on the property. (Tr. 39: 6–8.) From 600 South, officers could see the vehicle occupants walking from the parking structure to the building. (Tr. 39: 17–40: 3.) The parking structure is comprised of a "carport and a parking area on the top level and . . . a basement . . . lower level parking area as well." (Tr. 98: 8–13.) It is 260 feet approximately from the parking structure to the stairwell at the entrance of the subject apartment. (Tr. 115: 10–24.) Upon the tip and vehicle surveillance, officers pursued the warrant. (Tr. 42.)

### THE SEARCH

Having received the search warrant, Detective Madsen gathered the other officers offsite and put together a "tactical plan," specifying "how [they] were going to safely execute the search warrant." (Tr. 11: 22–25, 65: 7–13.) The other officers were briefed "on the search warrant . . . and what the search entailed." (Tr. 12: 10–13.) Detective Madsen "informed [the other officers] that [they] were looking . . . for keys, any other documents or items related to the theft of that motor vehicle."[6] (Tr. 69: 18–23.)

---

[6] Detective Kresdon Bennett testified that he believed Detective Madsen told the officers that the "vehicle was taken under fraudulent means . . . by an individual . . . utilizing a stolen identity . . . out of another state," which he "believed . . . was Texas." (Tr. 89: 4–10.) It was his understanding from Detective Madsen "that the victim had a normal account or reoccurring

The officers conducted a "knock and announce search," in which they "approached in what [they] call a stick," or a line. (Tr. 12: 1–3, 17–19.) An officer "who was equipped with a ballistic shield" knocked and when someone answered the door, the officers "moved [their] way into the apartment [and] secured that individual." (Tr. 12: 19–13: 8.)

The officers entered the house and went into the living room. (Tr. 15: 7–9.) The kitchen was "to the immediate right of the entry or the south end of that living room" (Tr. 15: 16–18), and a hallway led to the bedrooms with a closet (Tr. 16: 3–9). There were two bedrooms at the end of the hall, one on the north side and one on the south. (Tr. 18: 12–14.) Officers observed other individuals in the apartment and secured them before conducting a "safety sweep of the apartment for officer safety reasons." (Tr. 13: 8–13.)

During the safety sweep, each officer had a "specific . . . area or role." (Tr. 13: 17–25.) While conducting the safety sweep, the officers were "looking in closets and rooms and anywhere where a person could be" and "observing whatever they happen[ed] to observe." (Tr. 14: 9–14.) "[T]ypically" the team involved in the safety sweep is "looking for anything that can harm" the officers. (Tr. 67: 1–2.) This includes "weapons that are immediately accessible" and "anything that can be immediately destroyed." (Tr. 67: 3–7.) During the safety sweep, Detective

---

account through the rental company and they had contacted him. Either the vehicle was over-rented . . . . but he had contacted the rental company to figure out what was going on because they had contacted him and that is when the victim had identified to the rental company that he did not rent that vehicle, that somebody had used his identity and account to rent that vehicle. So basically a fraudulent rental of that vehicle." (Tr. 89: 11–22.) Detective Bennett did not "recall any specific mention of an I.D. being presented to the rental car company, but that's again very typical from [his] training and experience. Persons will utilize an identity, create an I.D. card and/or driver's license or other means of a photo identity to procure that or rent those vehicles under those fraudulent pretenses." (Tr. 90: 3–9.) Detective Bennett had no information before the search except what was conveyed by Detective Madsen. (Tr. 90: 19–21.)

Kresdon Bennett[7] observed "a handgun magazine located or observed on the kitchen counter," which was of concern because "usually with a firearm magazine there is a firearm." (Tr. 67: 11–20.) But they found no firearm in the initial sweep. (Tr. 67: 24–68: 1.)

After the safety sweep but before further investigation, Detective Madsen placed the warrant on the counter, and an officer designated the "finder" took pictures of the apartment. (Tr. 15: 21–25; 19: 6–9, 97: 12–16.) The finder took photographs of the various rooms in the apartment, about which photographs Detectives Madsen and Bennett testified before the search commenced. (Tr. 106: 18–107: 1.)

The finder photographed the keys in the kitchen. (Exhibit L.) He also documented the following items: keys (Tr. 96: 21–97: 3), "a Utah driver's license, a cell phone, a bag of substance which [Detective Madsen] would say is marijuana, a rolled up dollar bill, . . . white powdery substance believed to be cocaine on the counter, a knife, . . . a magazine of a semi-automatic pistol, some Swisher Sweet Cigarillos, cigarettes, Visine, and [a] big black item . . . may be a speaker" (Tr. 16: 18–17: 2; Exhibit 14).

Detective Madsen's role was to interview the detained individuals, which he did in the north bedroom. (Tr. 18: 3–8.) He did not take the photographs or observe the items found in the kitchen, which are depicted in Exhibit 14. (Tr. 29: 5–17.) He never saw the keys to the vehicle until much later in the investigation. (Tr. 29: 18–22.)

Detective Bennett was assigned as "a part of the entry team" and then as "a searcher to conduct a search" of "the south most bedroom of the two bedroom apartment." (Tr. 65: 16–24.)

---

[7] Detective Bennett is a detective with the Unified Police Department who has been in law enforcement for fourteen years. (Tr. 61: 6–10.) He is a street crimes detective and a task force officer with the Department of Homeland Security. (Tr. 61: 13–17.) In his position he investigates stolen vehicles "on a weekly or biweekly basis." (Tr. 62: 24–25.)

Detective Madsen had previously informed Detective Bennett that they were investigating a "stolen vehicle, the vehicle was taken out of the Las Vegas area from a rental company." (Tr. 68: 23–69: 1.) He had never seen the report himself, but Detective Madsen had "relayed to him . . . that stolen identity was utilized to procure that stolen vehicle or rent that vehicle. The rental company was notified by the person that's identity was stolen that he had not rented it or something to that effect." (Tr. 69: 5–12.) Based on his experience, Detective Bennett considered the range of items to be "from very small items such as a driver's license, . . . realistic or fraudulent, . . . all the way up to the rental paperwork or any kind of documentation related to that rental of that vehicle." (Tr. 70: 4–8.) Therefore, he understood they were "looking at any areas that could conceal or hold those items." (Tr. 70: 9–10.) This was consistent with his prior investigations, though he was unable to recall a specific case in which that had occurred. (Tr. 71: 2–17.)

In the south bedroom, Detective Bennett searched in a "systematic and . . . meticulous way," taking approximately thirty to forty-five minutes. (Tr. 86: 8–11, 18–20.) He was looking for items "related to the fraudulent obtaining of the vehicle." (Tr. 86: 12–14.) And he did not stop searching, or believe he was obligated to, when the keys were found, because he "was looking for other evidence of the crime," including "documents, identification, rental agreements, anything that would tie any individual from that apartment to that stolen vehicle." (Tr. 87: 3–16.)

During his search, he found the following: a black bag with "at least one credit card and other documents" (Exhibit 17; Tr. 76: 1–6); a folder containing "numerous identifications," specifically three driver's licenses "from at least two different states" bearing three different names and VISA cards that appeared "somewhat fraudulently made" (Exhibits 18 & 19; Tr. 76:

15–77: 9); multiple books of checks (Exhibits 21, 22, 23, 29, 30, & 32; Tr. 78: 23–80: 6, 82: 21–83: 14, 84: 5–9); other identification cards and credit cards (Exhibits 24 & 26; Tr. 80: 8–15, 81: 21–82:3); a hologram like those used to emboss a driver's license (Exhibit 25; Tr. 81: 7–11); a bag containing a pistol with an extended magazine (Exhibits 27 & 28; Tr. 82: 5–19); and a file folder such as one might receive after opening a bank account (Exhibit 31; Tr. 83: 16–19). He also found an embossing machine "that you put a blank credit card in and then it embosses those numbers and/or name, expiration date onto those credit cards" (Exhibit 33; Tr. 85: 1–6), a foil machine the purpose for which Detective Bennett did not know (Exhibit 34; Tr. 85: 11–15), and a credit card skimmer used for "reading other person's credit cards and/or encoding those credit cards with other information from other credit cards" (Exhibit 35; Tr. 18–23).

Detective Sergeant Jaren Fowler "was the evidence custodian for the search warrant." (Tr. 105: 8, 17–19.) He was tasked with "documenting all of the evidence" by "log[ging] it, document[ing] it, and then later book[ing] it into evidence." (Tr. 105: 22–25.) He authorized the return of the keys and vehicle to the owner. (Tr. 107: 14–18.)

Mr. Kafuku was not in the apartment when officers initially entered, but he eventually arrived on scene and was taken into custody. (Tr. 23: 11–22.) During the search, officers found "documentation about possible other vehicle that had recently been purchased using this name of the—I can't remember specifically [D.H.], or whatever, to I want to say like a silver Hyundai Sonata and it was purchased here locally just recently." (Tr. 47: 6–12.) Officers returned to the Millcreek complex to look for the vehicle, but the Hyundai arrived at the Brigadoon with "two black males" who exited the vehicle and walked to the subject apartment, one of whom was Mr. Kafuku. (Tr. 47: 13–22.)

After the search, all items, other than the keys, were "booked into evidence" at a secure Unified Police Department location. (Tr. 27: 14–19.) The vehicle was "towed on . . . a state tax impound." (Tr. 27: 20–24.) The intention being that the vehicle be returned to its rightful owner. (Tr. 28: 5–7.) The keys were returned to the rental car company with the car. (Tr. 20: 18–21, 42: 2–6.)

### MR. KAFUKU'S INTEREST IN THE APARTMENT

Officers also testified that in conjunction with the search, officers obtained copies of documents pertaining to the Brigadoon apartment. (Tr. 23: 23–24: 5.) After the search, officers spoke with the landlord "to get more information with regard to the rental of the apartment." (Tr. 24: 6–10.) The relevant documents were submitted into evidence as Exhibit 1. (Tr. 24: 11–25: 4.) The documents include the identification information for a man named D.H., including an identification card with his information but bearing the picture of a person Detective Madsen identified as Mr. Kafuku. (Tr. 25: 20–26: 9; 2nd Tr. 10: 20–12: 1.) Officer follow up concluded that D.H. was a real person but was not the person pictured on the driver's license. (Tr. 26: 22–27: 2.)

During a second evidentiary hearing on the Motion, Mr. Kafuku testified that he did not fill out the application for the Brigadoon apartment but that he authorized a friend, Mr. Samy Lihau, to complete the application, with the intent that they would be roommates. (2nd Tr. 4.) As a part of the application, Mr. Kafuku gave Mr. Lihau a picture of himself so that Mr. Lihau could make an identification card and $400 cash for the deposit. (2nd Tr. 4: 4–5, 17–21; 8: 12–23.) Although Mr. Kafuku did not complete any of the paperwork himself (2nd Tr. 14: 10–13), he knew that Mr. Lihau used D.H.'s name (2nd Tr.15: 8–19; 16: 7–14). He testified that Mr. Lihau told him about doing so after the application was submitted but before they moved into the apartment. (2nd Tr. 15: 16–19; 16: 7–14.)

After Mr. Kafuku and Mr. Lihau were granted the lease, Mr. Kafuku moved into the south bedroom. (2nd Tr. 5: 13–14.) His personal belongings included sneakers and a blue bag. (2nd Tr. 6: 2.) He did not have bedroom furniture, as he was saving money for that purchase. (2nd Tr. 5: 7–12.) He had, however, contributed to the purchase of furniture for the communal living room. (2nd Tr. 4: 22–5: 2.) Along with Mr. Kafuku and Mr. Lihau, there were "four or five" other people who lived in the apartment. (2nd Tr. 8: 6–11.) There were two additional occupants of the south bedroom. (2nd Tr. 8: 11.)

### OFFICERS' BELIEFS AND UNDERSTANDING

In the evidentiary hearing on this Motion, Detective Madsen testified that he sought leave to search for "any other evidence of the auto theft" because "in [his] experience" there can be "different reasons" for or "instrumentalities of" auto theft. (Tr. 20: 22–21: 6.) Officers believed the investigation, which involved returning the stolen property to the rightful owner as well as identifying the perpetrator, was facilitated by searching the apartment rather than just stopping the vehicle because

> where we obtained the information about a vehicle being obtained by fraudulent means, usually people don't have I guess fraud or forgery machines in their car like that's not their shop, it's usually not powered that way. It's usually powered at a business or a residence or an apartment or something like that where there is like a wall plug. So if somebody was say making a fake I.D. to obtain a rental car for whatever reason, they usually don't make the I.D. inside of the car itself, they would likely do that inside of some type of building or residence.

(Tr. 56: 17–57: 6.) The alleged theft in this case was "by fraudulent means so [the officers] had presumed that there would be some type of documentation or something or hope that there would be documentation for evidence that would assist [them] with that particular portion of the auto theft." (Tr. 21: 6–11.) They "knew that somebody else's identity was used to rent the vehicle in Las Vegas, whether that meant driver's licenses, credit card receipts, anything like that." (Tr. 21:

12–15.) As such, the "any other evidence" language was in this case intended to be "anything specifically related to the rental or obtaining of the vehicle meaning stuff from the rental car company . . . [a]nd also other documentation that might indicate a false I.D. was used or false credit and or things like that." (Tr. 21: 16–24.) None of this information, of course, was included in the affidavit supporting the request for the search warrant.

Detective Madsen "presumed based on past experience" that a fake identification card had been used. (Tr. 58: 5–11.) He testified that in his experience and training, "fraudulent means" means "somebody used some type of identity or something to obtain that. . . . Usually rental car companies don't rent cars to people just on their handshake. They usually have to have some form of valid identification, a driver's license." (Tr. 54: 9–14.) And he understood that those documents would usually be produced by a "fraud or forgery machine[]" that "would likely" be "inside some type of building residence." (Tr. 56: 20–57: 6.) He could not, however, specify particular instances in his prior experience that caused him to believe there would be equipment in the Brigadoon apartment for production of false identification cards. (Tr. 59.) When the court asked him to do so, he responded, "I can't off the top of my head think of a specific case . . . but I have been a party to several search warrants" involving fraudulent machines "[a]nd often or at least some of those times vehicles were involved. . . . But off the top of my head, I can't recall a specific instance." (Tr. 59: 2–21.)

Detective Madsen believed the other officers were on the same page with regard to the use of a false identification card, "since [they] had been on this case for several hours. [He] didn't know if everyone specifically . . . knew . . . that, but it was a part of the entire case like it was general knowledge that the car was stolen and that it was obtained fraudulently." (Tr. 22: 7–13.) He admitted, however, that he had no information to support this assumption other than the

"information received from Las Vegas that [the vehicle] was obtained by fraudulent means." (Tr. 42: 7–13.)

Detective Madsen further testified that he understood the warrant's language permitting them to search for "any and all illegal contraband located during the scope of the search for the keys" to encompass a "fake I.D. or fake credit cards or something like that that there may be instrumentalities of that specific crime, meaning some kind of machine or printing device or something like that that would have been used to obtain those fraudulent documents for the rental." (Tr. 22: 20–23: 10.) But again, as Detective Madsen acknowledged, neither the affidavit nor the warrant contained information about the use of a fraudulent I.D. and officers "didn't know specifically that a fraudulent I.D. was used first." (Tr. 44: 4–7, 12–16; Exhibit 3.)

## ANALYSIS

Mr. Kafuku argues the Fourth Amendment requires this court to suppress the evidence that officers found in the Brigadoon apartment because the Brigadoon apartment was his residence, entitling him to privacy, and the instant search failed to comply with the Fourth Amendment. (Defendant's Opening Brief 6, ECF No. 43.) He argues the warrant was invalid because it did not establish a minimal nexus between the searched location and criminal activity, because no reasonable officer could believe probable cause existed for the search based on the affidavit Detective Madsen submitted, and because Detective Madsen's affidavit contained falsehoods.[8] The United States counters that, even if the search was improper, Mr. Kafuku had

---

[8] Mr. Kafuku also argues that even if the warrant had been valid, officers exceeded the scope. While it is true that a "general, exploratory rummaging through personal belongings" would be a violation of the Fourth Amendment, a valid search warrant "accomplishes this . . . objective by requiring a 'particular description' of the things to be seized." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). Because the court concludes the warrant was not valid, it need not address whether the search complied with the warrant.

no Fourth Amendment right to privacy at the Brigadoon apartment. The court addresses each of these arguments in turn.

**Lawfulness of the Search**

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. A search is valid and not unreasonable if it is pursuant to a "warrant . . . supported by probable cause," which "require[es] more than mere suspicion but less evidence than is necessary to convict." *United States v. Danhauer*, 229 F.3d 1002, 1005 (10th Cir. 2000). If the warrant is not based on probable cause, and the officers did not rely on the warrant in good faith, the court must ordinarily "invoke the exclusionary rule to exclude the Government's introduction of the unlawfully seized evidence as direct evidence against the defendant in a criminal prosecution." *United States v. Herrera*, 444 F.3d 1238, 1248 (10th Cir. 2006). Therefore, this court must determine whether there was probable cause to support the warrant, which Mr. Kafuku concedes officers served during the search. This determination must be made based on evidence presented to and known by the magistrate issuing the warrant. After the fact justification cannot otherwise support an improvidently issued warrant. And because the court concludes the affidavit did not support probable cause, it must also determine whether the officers nonetheless acted in good faith in relying on the warrant. [9]

    (1)      Validity of the Warrant

A warrant is valid if the affidavit upon which it was granted sets out probable cause for the search. *U.S. v. Biglow*, 562 F.3d 1272, 1280 (10th Cir. 2009). The affidavit must set forth some basis to conclude criminal activity occurred and that evidence of the criminal activity will

---

[9] Mr. Kafuku additionally argues that the warrant contains "recklessly false statements" and that the search exceeds the scope of the warrant. Given the court's disposition, it declines to consider these arguments.

be found in the place to be searched. *United States v. Gonzales*, 399 F.3d 1225, 1228 (10th Cir. 20015). It must set out "a nexus . . . between suspected criminal activity and the place to be searched." *Biglow*, 562 F.3d at 1278. Whether a sufficient nexus exists is a fact specific inquiry to be measured according to the Fourth Amendment touchstone of reasonableness. *Id.* at 1279. And "[p]robable cause is a 'practical, nontechnical conception,' designed to operate in conjunction with the 'commonsense,' 'practical considerations of everyday life,' rather than the elaborate rules employed by 'legal technicians.'" *Id.* at 1281 (quoting *Illinois v. Gates*, 462 U.S. 213, 230–31 (1983)).

In evaluating an affidavit, the court owes deference to the magistrate judge's probable-cause ruling as long as the "magistrate judge's 'neutral and detached function' has been properly fulfilled'"; the reviewing court's role "is merely to ensure the Government's affidavit provided a "substantial basis for reaching th[e] conclusion" that "probable cause exists." *Id.* at 1281 (quoting *Gates*, 462 U.S. at 236). But the magistrate's finding cannot be based on wholly conclusory statements, and this court is obligated to disregard those statements in reviewing a warrant for probable cause. *See Gates*, 462 U.S. at 239.

Further, the court cannot rely on the instinct of the officer seeking the warrant or of witness accounts that are not accompanied by the information necessary for a magistrate to evaluate the witness account. In 1933 the Supreme Court in *Nathanson v. United States*, 290 U.S. 41 (1933), concluded evidence should have been suppressed by the trial court where the warrant was issued "upon a mere affirmation of suspicion and belief without any statement of supporting facts," *id.* at 46. In *Nathanson*, the court made clear that "[m]ere affirmance of belief or suspicion is not enough" to support a warrant to search a residence. *Id.* at 47. The court applied its *Nathanson* conclusion in *Illinois v. Gates* in concluding that an anonymous letter that detailed

an alleged criminal scheme but provided no foundation or basis upon which the court could assess the reliability or credibility of the letter writer could not alone support a finding of probable cause. 462 U.S. at 225–27.

The affidavit here provides no evidence from which a reasonable magistrate could conclude a crime occurred. The only evidence of a crime is that detectives "were notified of the possible location of a stolen vehicle take from Las Vegas Nevada sometime in February 2018." (Exhibit 3.) It provides no evidence about the make and model of the allegedly stolen vehicle or the location from which the vehicle was purportedly stolen. The only statements about the means by which the alleged theft occurred is that "officers applied for and" obtained a GPS tracking warrant "[b]ased on the nature of the theft, and the fraudulent means surrounding how the vehicle was obtained." (Exhibit 3.) It does not say when the vehicle went missing. It does not specify whether the car had disappeared from the lot or if a person rented it and only later the rental company learned the rental was fraudulent. Instead it sets forth conclusory statements that the vehicle was "stolen" by "fraudulent means." Detective Madsen's conclusory statements "cannot support probable cause." *Gates*, 462 U.S. at 239. Therefore, excluding the conclusory statements that the vehicle was stolen, there was no probable cause of a crime, and the warrant is therefore invalid.

But even if the affidavit had set forth evidence that in fact criminal activity occurred, it does not set forth a sufficient nexus between the evidence to be searched for, as identified in the warrant, and the Brigadoon apartment. The only connection was that officers saw one of the drivers enter the Brigadoon apartment on multiple occasions and that they saw the driver carrying the keys. The driver was not Mr. Kafuku. Although Detectives Bennett and Madsen believed that theft by fraud would entail a false I.D. card and that such materials reasonably be

expected to be found in a building or residence, the affidavit did not provide a substantial basis upon which the magistrate could conclude that a false I.D. card was used in this case or that the Brigadoon apartment was that building or residence. While the magistrate could have concluded the keys would be in the Brigadoon, there is no basis upon which he could conclude probable cause existed for the belief that any other evidence of the purported crime would be found there. In fact, the affidavit makes no reference to documents, identification cards, or any evidence other than the keys. Indeed, there is no factual basis in the affidavit for the magistrate to conclude that the car parked at the Brigadoon apartment was even the same car that went missing from the Las Vegas rental agency. Because the affidavit in support of the warrant did not set out probable cause for the magistrate to conclude a crime occurred or that the evidence identified would be found in the location to be searched, the court concludes it was an invalid warrant.

During the evidentiary hearing, the testifying officers discussed the investigation in detail, and they shared their beliefs and understanding about what type of evidence might have been found and where it might be found. But their after-the-fact testimony is irrelevant because it was not before the magistrate at the time he was assessing probable cause and issuing the warrant. *Gates*, 462 U.S. at 238. Because the officers did not document their understanding in the affidavit, it is irrelevant to this court's determination of whether the magistrate had probable cause to issue the warrant. *Id.* at 238–39.

(2) Good Faith Reliance Upon a Deficient Warrant

Even when a warrant is not based on probable cause, a defendant is not entitled to suppression when the officers conducted the search based on objective good faith reliance upon a warrant. *United States v. Leon*, 468 U.S. 897, 920 (1984). This is because, "[p]enalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." *Id.* at 921. The fruits of an invalid warrant should

only be suppressed in four circumstances: (1) "the issuing magistrate was misled by an affidavit containing false information or information that the affiant would have known was false if not for his reckless disregard for the truth;" (2) if "the issuing magistrate wholly abandons her judicial role;" (3) if "the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" and (4) if the "warrant is so facially deficient that the executing officer could not reasonably believe it was valid." *Danhauer*, 229 F.3d at 1007 (quoting *Leon*, 468 U.S. at 922–23). It is the government's burden to prove "that its agents' reliance upon the warrant was objectively reasonable." *United States v. Roach*, 582 F.3d 1192, 1204 (10th Cir. 2009).

The United States has not met its burden to show objective good faith, because as previously stated, there was no indicia of probable cause in the affidavit supporting the facts. The affidavit claimed a crime occurred but provided no evidence from which the magistrate could reach that conclusion, and it set out no nexus between the evidence sought and the location to be searched. Because the warrant was supported by no indicia of probable cause, the officers who searched the Brigadoon apartment did not do so in good faith reliance upon the warrant.

## Standing

Although the warrant was invalid and the officers did not conduct the search in good faith, Mr. Kafuku is only entitled to suppression of the evidence against him if he had a privacy right protected by the Fourth Amendment.[10] *Rakas v. Illinois*, 439 U.S. 128, 134 (1978). The

---

[10] Ordinarily, a conclusion that standing is lacking means the court must not render further analysis, as standing for Article III purposes is a threshold jurisdictional question. In the Fourth Amendment context, however, the court has said "standing" is a misnomer and that it is not jurisdictional. *Byrd v. United States*, 138 S. Ct. 1518, 1530 (2018) ("The concept of standing in Fourth Amendment cases can be a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search; but it should not be confused with Article III standing, which is

Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Because Fourth Amendment rights are personal, a defendant 'may only claim the benefits of the exclusionary rule if [his] own Fourth Amendment rights have in fact been violated.'" *United States v. Johnson*, 584 F.3d 995, 999 (10th Cir. 2009) (quoting *United States v. Jarvi*, 537 F.3d 1256, 1259 (10th Cir. 2008)). The burden to prove such a violation is on the defendant seeking suppression. *Id.* at 998. Specifically, the defendant must show he can satisfy the following two steps: "(1) 'whether the defendant manifested a subjective expectation of privacy in the area searched' and (2) 'whether society is prepared to recognize that expectation as objectively reasonable.'" *Id.* at 999 (quoting *United States v. Allen,* 235 F.3d 482, 489 (10th Cir.2000)).

In its oral argument, the government argued Mr. Kafuku lacked even a subjective expectation of privacy, because he admitted he knew Mr. Lihau acquired the apartment through fraudulent means. But the court need not reach this issue. Even assuming Mr. Kafuku had a subjective expectation, he cannot prove his subjective expectation was objectively reasonable and one that society is prepared to accept. "There is no talismanic test to determine whether an expectation of privacy is one that society is prepared to accept as reasonable." *Id.* It appears, however, that the "ultimate question" is a normative one. *Id.* at 1000–01. A "[l]egitimation of expectations of privacy must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized

jurisdictional and must be assessed before reaching the merits.").

and permitted by society." *Byrd v. United States*, 138 S. Ct. 1518, 1522 (2018) (quoting *Rakas*, 439 U.S. at 144 n. 12).

It is true that "the common law maxim 'every man's house is his castle' is part of our Fourth Amendment jurisprudence prohibiting unreasonable searches and seizure." *United States v. Gay*, 240 F.3d 1222, 1226 (10th Cir. 2001). But that maxim is not without exception. *See Kyllo v. United States*, 533 U.S. 27, 31–32 (2001). And where an individual comes to possess through fraud a property in which he may otherwise have had a privacy right, the reasonableness of the expectation is called into question. *Johnson*, 584 F.3d at 1001. This is because there is no doubt "that 'wrongful presence at the scene of a search would not enable a defendant to object to the legality of the search.'" *Byrd*, 138 S. Ct. at 1529 (quoting *Rakas*, 439 U.S., at 141 n. 9). Therefore, "[n]o matter the degree of possession and control, the car thief would not have a reasonable expectation of privacy in a stolen car." *Id.*[11]

Applying this reasoning in *Johnson*, the Tenth Circuit concluded that a defendant did not have a protected privacy interest in a storage unit where he stored his possessions. 584 F.3d at 1004. The *Johnson* court affirmed the denial of a motion to suppress evidence found during the search of a storage unit that the defendant's girlfriend had rented under a stolen identity using cash. *Id.* at 996–98. Police notified the identity theft victim that a storage unit had been rented in her name, and she consented to the police entering and searching the storage unit that was

---

[11] Although the government argued before the Supreme Court that the defendant in *Byrd* had intentionally used a straw man to rent the car that he would not have been able to rent himself, which would have made his conduct a crime of fraud, the court did not resolve that issue because the Government had not preserved it below. 138 S. Ct. at 1531 ("The Court leaves for remand two of the Government's arguments: that one who intentionally uses a third party to procure a rental car by a fraudulent scheme for the purpose of committing a crime is no better situated than a car thief; and that probable cause justified the search in any event.").

fraudulently ordered in her name. *Id.* at 997. Although the court was impressed with the high degree of privacy a person may expect in a locked storage unit, the Tenth Circuit concluded that under the circumstances the defendant lacked standing to challenge the search. *Id.* at 1001. The court distinguished between the use of an alias and use of a stolen or fraudulent identity and emphasized that the latter is illegal and causes harm to third parties in concluding that the latter does not have a reasonable expectation of privacy while the former might. *Id.* at 1002. The *Johnson* court further reasoned that the defendant did not have a reasonable expectation of privacy under those circumstances because the innocent third party has a right to access the property, meaning the defendant could not have exercised the right to exclude. *Id.* at 1003–04. And the court was unpersuaded that the defendant's payment for the unit created a privacy interest where one would not have existed if he had not paid or had used fraudulent means to do so. *Id.* at 1002–03. Ultimately, the court concluded that to decide the defendant had a reasonable expectation of privacy in a storage unit he used with the knowledge that it was fraudulently acquired would make the court "a party to th[e] fraud," which outcome it was unwilling to reach. *Id.* at 1004.

Mr. Kafuku's argument that this court should not follow *Johnson* because there is a greater expectation of privacy in a residence than in a storage unit is unpersuasive. First, his argument assumes that the home is sacrosanct for purposes of Fourth Amendment analysis, which is an overstatement of the protections afforded to the home. *See Kyllo*, 533 U.S. at 31–32. Second, his argument assumes that storage units are not the sort of place a person should have a strong expectation of privacy, but the Tenth Circuit stated just the opposite in *Johnson*. 584 F.3d at 1001 (quoting *United States v. Salinas-Cano*, 959 F.2d 861, 864 (10th Cir. 1992)) ("People

generally have a reasonable expectation of privacy in a storage unit, because storage units are secure areas that 'command a high degree of privacy.'").

Although *Johnson* did not involve a residence, its logic is consistent with the weight of circuit court decisions, which have consistently held that a person who acquires property through some wrongful means does not have a reasonable expectation of privacy on that property, even where the subject property is the person's home. Courts have held that the following individuals have no reasonable expectation of privacy: a trespasser living in a cave on federal public lands, *United States v. Ruckman*, 806 F.2d 1472, 1472–74 (10th Cir. 1986); a defendant who was arrested after he was found in his girlfriend's home while a restraining order was in place to keep him from her home, *United States v. Schram*, 901 F.23d 1042 (9th Cir. 2018); squatters who had set up a community on private property, *Amezquita v. Hernandez-Colon*, 518 F.2d 8, 11–12 (1st Cir. 1975); guests of squatters, *United States v. Whitehead*, 415 F.3d 583, 587–88 (6th Cir. 2005); *Zimmerman v. Bishop Estate*, 25 F.3d 784, 787 (9th Cir. 1994); an individual who had been evicted and given notice from a home he had previously legitimately occupied, *United States v. Curlin*, 638 F.3d 562, 565 (7th Cir. 2011). These cases demonstrate that "[s]ociety is not prepared to recognize as reasonable the expectation of privacy of an individual who unlawfully occupies a piece of property," regardless of whether it is the person's home. *Olvera v. City of Modesto*, 38 F. Supp. 3d 1162, 1170 (E.D. Cal. 2014). Therefore, *Johnson* governs the standing question in this case.

Under *Johnson*, any expectation of privacy Mr. Kafuku may have had in the Brigadoon apartment was not reasonable because of the terms under which he came to occupy the apartment. Mr. Kafuku testified that he knew his friend was renting the apartment in D.H.'s name. And D.H. is an innocent victim of identity theft. Those simple facts overcome any

expectation Mr. Kafuku may have had because the apartment was his residence. Because he was wrongfully occupying the apartment, he was not entitled to Fourth Amendment protection and does not having standing under the Fourth Amendment. Therefore, he is not afforded the protection of the exclusionary rule, and this court will not suppress the evidence against him.

## CONCLUSION

Because Mr. Kafuku lacked standing to file his Motion to Suppress, the court must deny the Motion despite having found that the search in the instant case was pursuant to an invalid warrant and therefore in violation of the Fourth Amendment. The court will hold a scheduling conference on Monday, December 17, 2018, at 3:30 p.m. in courtroom 8.100.

DATED this 7th day of December, 2018.

BY THE COURT:

Clark Waddoups
United States District Court Judge